**UNITED STATES of America, Appellee,**

v.

**Luis TORRES, a/k/a "Gustavo Vera", a/k/a "Guillermo Blandon", a/k/a "Jose Velez", Virginia Moran, Martha Guzman, Hernando Caro, Leocadio Caro, Defendants-Appellants.**

**Nos. 1032–1035 and 1038, Dockets 83–1436 to 83–1440.**

United States Court of Appeals, Second Circuit.

Argued May 10, 1984.

Decided July 17, 1984.

Carol B. Schachner, Asst. U.S. Atty., Raymond J. Dearie, U.S. Atty., D.N.Y., Allyne R. Ross, Asst. U.S. Atty., Brooklyn, N.Y., for appellee.

Lawrence M. Herrmann, New York City, for defendant-appellant Torres; Richard A. Greenberg, Coblence & Warner, New York City, of counsel.

Lewisohn, Eisenberger & Fuchs, New York City, for defendant-appellant Moran; Jeffrey L. Lewisohn, New York City, on brief.

Philip Katowitz, Brooklyn, N.Y., for defendant-appellant Guzman.

Steven H. Mosenson, Baden, Kramer & Huffman, New York City, for defendant-appellant Hernando Caro.

Bert H. Nisonoff, Forest Hills, N.Y., for defendant-appellant Leocadio Caro.

Before OAKES and VAN GRAAFEILAND, Circuit Judges, and BONSAL, District Judge.*

BONSAL, District Judge:

Luis Torres (a/k/a "Gustavo Vera", a/k/a "Guillermo Blandon", a/k/a "Jose Velez"), Virginia Moran, Martha Guzman, Hernando Caro, and Leocadio Caro, the defendants, appeal from their convictions of violations of the narcotics laws, 574 F.Supp. 1429. By indictment filed June 2, 1983 the defendants, together with Edilma Perez a/k/a "Mima", were charged with one count of conspiracy to distribute cocaine and one count of possession with intent to distribute cocaine. Defendant Perez pled guilty to both counts of the indictment and has not appealed. Defendant Torres pled guilty to Count 2 of the indictment (possession with intent to distribute), his plea being conditioned on his right to appeal the denial of his motion to suppress. The remaining defendants went to trial and were convicted by a jury on both counts. All of the defendants have been incarcerated for varying terms. They now appeal. The facts may be briefly stated:

On May 23, 1983, members of Group IV of the New York Drug Enforcement Task Force ("Task Force") arranged for a confidential informant to telephone his supplier (who had supplied him with cocaine in the past) and to order ⅛ of a kilogram of cocaine. The informant telephoned his supplier, who agreed to deliver ⅛ of a kilogram to the informant later that day. The delivery was later rescheduled to take place at 6:00 p.m. on the next day, May 24, at 147th Street and Amsterdam Avenue in Manhattan. The informant described his supplier as a female Hispanic called "Mima" (subsequently identified as Perez) and gave her telephone number to Task Force agents. According to Telephone Company records, the number was listed to "Luisa Santiago", who resided at 92–16 Whitney Avenue, Apartment 110, Queens.

On May 24, at approximately 5:00 p.m., surveillance was established in the vicinity of 92–16 Whitney Avenue, Queens, and at Amsterdam Avenue and 147th Street in Manhattan. At approximately 6:10 p.m. an individual fitting Perez's description was seen leaving the Whitney Avenue address and entering a white Dodge Aspen. This information was relayed to the surveillance agents in Manhattan. At approximately 6:35 p.m. the Dodge Aspen was observed arriving at 147th Street and Amsterdam Avenue and Perez exited the car. She was joined by the informant and together they entered a social club on the corner. The Dodge Aspen departed. At about 7:10 p.m.

* Of the Southern District of New York, sitting by designation.

Perez and the informant left the club and, after a brief conversation, Perez hailed and entered a taxi cab. Surveillance agents followed the cab into Queens, at which point they stopped the taxi cab and placed Perez under arrest. A search of her person produced approximately ⅛ of a kilogram of over 90% pure cocaine wrapped in a yellow paper towel, and $2,551 in cash.

Following her arrest, Perez was advised in Spanish of her *Miranda* rights. She waived her rights and consented to a search of her Whitney Avenue apartment. Detectives Martinez and Prakin accompanied her to 92–16 Whitney Avenue where she was taken to the Superintendent's apartment to verify that she resided in Apartment 110. The Superintendent confirmed that she did, and accompanied her and the detectives to the apartment, where the Superintendent knocked on the door. The door was partially opened by someone inside, whereupon Detective Prakin announced that it was the police. A woman inside the apartment (subsequently identified as defendant Virginia Moran) attempted to close the door but was prevented from doing so by Detective Prakin, who entered the apartment, followed shortly thereafter by Detective Martinez. As Detective Prakin entered, he observed an O'Haus triple-beam scale on top of a refrigerator in the kitchen. Detective Prakin walked down the hallway where he observed a second woman (subsequently identified as Martha Guzman) in the apartment. He also entered the larger of two bedrooms through an open door and observed a small amount of white powder on a dinner plate which had been placed on top of a pillow on the bed, two inches below a high-intensity light. Subsequent laboratory analysis of the powder revealed that it was approximately 40% pure cocaine. At this point, Detective Prakin arrested Moran and Guzman, and Detective Martinez gave them each their *Miranda* rights in Spanish, which they acknowledged. Perez signed a written consent to the search of the apartment. The search produced the following items:

In the smaller of the two bedrooms a white purse containing $1,585 in cash was found on the top shelf of a closet. On the floor of the same closet, the officers discovered another purse which contained two Colombian passports. Virginia Moran's picture appeared on both passports. One passport was in the name of "Virginia del Carmen Moran de Guzman" and had an expiration date of January 15, 1987; the other was in the name of an alias, "Mariela Restrepo de Velez", contained a visa in the name of "Mariela de Velez", and bore notations indicating that the user had most recently entered the United States on August 11, 1982. In the same room, a yellow kitchen cannister containing $2,084 in cash was found lying on the floor in front of another closet. An unsealed brown paper bag containing $1,203 in cash and over one-half kilogram of approximately 50% pure cocaine was also found on the floor.

During the search of the larger bedroom, various documents were found, including a slip of paper containing a handwritten telephone number, 218–3282, which turned out to be the telephone access number of a beeper later seized from the defendant Torres. The agents also found a small notebook containing handwritten notations on four of its pages. On one page, headed "M.V." a column of monetary figures ranging from 400 to over 5,000 appeared alongside a column of dates commencing with "November 9, 1982". Another page, headed "Marta", similarly listed a column of monetary figures ranging from 500 to 13,-000 next to several dates in February and March of 1983.[1] Two other pages contained various names, telephone numbers and what appeared to be coded information.

While the search was continuing, at about 8:40 p.m. the apartment buzzer sounded and one of the detectives pressed

---

1. At the trial, there was expert testimony that the figures appearing on the two pages headed "Marta" and "M.V." represented sums of money paid for services rendered in connection with the distribution of narcotics.

a button inside the apartment which allowed entry into the building. Detective Prakin positioned himself by the front door, with gun drawn. A few minutes later, in response to a knock on the door, Detective Prakin opened the door and said, "Police. Come on in." Two men (subsequently identified as defendants Hernando Caro and Leocadio Caro) were standing in front of the door, each holding a small leather handbag. The two men walked into the apartment, Leocadio first dropping a leather bag in the hallway. Detective Prakin retrieved the leather bag that Leocadio had dropped, opened it, and found inside three individually-wrapped plastic bags, each containing ⅛ of a kilogram of white powder which was subsequently analyzed and established to be 85% pure cocaine. Both the Caros were then placed under arrest.

Following their arrest, Detective Prakin examined the small leather bag which Hernando had brought into the apartment, which he thought might contain a weapon, and found approximately $200, a number of documents and papers, a car registration and insurance card, and several records of drug transactions which included entries "para Hernando" and "Leo". During the course of this search, the two Caros were given their *Miranda* rights in Spanish.

At about 9:35 p.m. the apartment buzzer again sounded and one of the detectives pushed the button permitting entry into the building. Following a knock on the front door, Detective Prakin opened the door and recognized the man before him as the person on whom he had served an arrest warrant in 1979 at the Metropolitan Correctional Center in New York City for firearms possession. The man, known to Detective Prakin as Gustavo Vera, was subsequently identified as the defendant Luis Torres. Detective Prakin also knew that Torres was a Colombian national who had been previously convicted of a federal narcotics violation. Detective Prakin pulled Torres into the apartment and, noticing a bulge in the chest pocket of his jacket, reached inside Torres' jacket and removed a brown paper bag containing white powder, which

upon laboratory analysis was found to be approximately 61 grams of over 86% pure cocaine. He placed Torres under arrest. A search of Torres revealed a beeper with an access number 218–3282, the same number found on the slip of paper in the larger bedroom. This search also produced some car keys, and the detectives later located Torres' car double-parked directly in front of the apartment building. A search of the car revealed $4,000 in cash in a paper towel located under the driver's seat.

## DISCUSSION

Defendants Moran, Guzman, and Hernando Caro each contend that the evidence at the trial was insufficient to permit the jury to convict them. All of the defendants contend that there was no probable cause for his or her arrest and, consequently, that the evidence seized from them or found in the apartment should have been suppressed.

The evidence brought out at the suppression hearing and at the trial established that when the detectives entered the apartment at 8:05 p.m. on May 24, 1983 it was being used as an active cocaine mill. Inside, the detectives found cocaine being processed, materials for its packaging and distribution, and substantial sums of money. With this background we judge the contentions of the several defendants.

While defendants Moran, Guzman and Hernando Caro each contend that there was insufficient evidence to sustain their convictions, the jury found each of them guilty. As the Supreme Court reminds us:

> It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it.

*Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Terry*, 702 F.2d 299, 315 (2d Cir.1983). Moreover, a defendant's participation in a conspiracy may be established by circumstantial evidence. *United*

*States v. Soto*, 716 F.2d 989, 991 (2d Cir. 1983); *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983). The test is not whether we are convinced beyond a reasonable doubt of the defendant's guilt, but whether a rational jury could find without a reasonable doubt that these defendants were guilty. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *United States v. LeRoy*, 687 F.2d 610, 616 (2d Cir.1982).

■ Applying these standards, a review of the record satisfies us that there was substantial evidence, taking the view most favorable to the government, to support the jury's convictions of defendants Moran, Guzman and Hernando Caro.

We turn next to the contentions of each defendant that there was no probable cause for his or her arrest and that the evidence taken from them or found in the apartment should have been suppressed. *Dunaway v. New York*, 442 U.S. 200, 208, n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979) teaches that:

> Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed [by the person to be arrested]. *Brinegar v. United States*, 338 U.S. 160, 175–76 [69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879] (1949), quoting *Carroll v. United States*, 267 U.S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543] (1925).

*See also United States v. Ceballos*, 654 F.2d 177, 184–85 (2d Cir.1981). We consider the contentions of each of the defendants in the order in which they were arrested.

### Defendant Moran

Moran was arrested by the detectives following their arrival at the apartment at 8:05 p.m. She contends that there was no evidence to connect her with the narcotics operation in the apartment and that although she was present when the detectives arrived, she "did not participate in any way with any alleged sale or distribution of cocaine." She argues that her mere presence in the apartment when the detectives arrived was not enough to support her conviction. *United States v. Soto*, 716 F.2d 989 (2d Cir.1983).

The government points out that, unlike the defendant in *Solo*, Moran tried to prevent the detectives from entering the apartment; that when the detectives entered, cocaine operations were being carried on; and that the detectives found two Colombian passports in the apartment issued in different names but bearing her picture, indicating that she may have travelled under an assumed name. Moreover, the dates on the passports indicated the probability that she had been in this country, and perhaps living in the aparatment, for some time. Before Moran left the apartment with the detectives she went to a closet in the small bedroom to get the clothes she wore when she left. This also raised an inference that she had been living in the apartment. We conclude that the evidence and the inferences that could be drawn from it were sufficient to support the jury's verdict finding Moran guilty under both counts of the indictment.

■ Moran contends that the admission of the Colombian passports was reversible error under Rule 403 of the Rules of Evidence on the ground that the prejudicial effect of their admission was far greater than their probative value. This, of course, was a matter within the discretion of the district judge; we do not find that he abused his discretion.

### Defendant Guzman

Guzman was also arrested by the detectives following their arrival at the apartment at 8:05 p.m. She also contends that her conviction should be reversed on the authority of *Soto*. She states that she was merely present in the apartment and had no connection with the narcotics operation. However, as with Moran, there was evi-

dence from which a jury could have found that she participated in the narcotics operation. Inside the apartment cocaine was being processed and materials for its packaging and distribution were in plain view. The detectives found a notebook in the closet which they believed reflected payments for services rendered in connection with the distribution of cocaine, and on one of the pages appeared the name "Marta", the Spanish equivalent of Guzman's given name. Guzman, as did Moran, went to a closet in the small bedroom and obtained the clothes she wore when she left the apartment, which indicated that she had been living in the apartment. This evidence and inferences that could be drawn from it were sufficient to support the jury's finding that Guzman was a member of the cocaine-selling conspiracy and participated in the sales made from the apartment.

*Defendants Leocadio Caro and Hernando Caro*

Leocadio and Hernando Caro arrived at the door of the apartment at 8:40 p.m., each carrying a leather bag. Before they arrived, the detectives had ascertained that the apartment was being used as a cocaine mill. When the detectives invited Leocadio and Hernando into the apartment, Leocadio took a step to his left and dropped the bag he was carrying. They both then entered the apartment, Hernando carrying a similar bag in his hand. Detective Prakin went out into the hall and retrieved the bag Leocadio had dropped. His examination of its contents revealed three 1/8 kilogram bags of cocaine. The detectives then arrested Leocadio and Hernando and searched Hernando's bag, which revealed a small sum of money and some papers. At the trial, Detective Prakin testified that the papers found in Hernando's bag included records of drug transactions.

*Leocadio Caro*

Leocadio contends that he was arrested without probable cause, that the bag he dropped outside the apartment and its contents should have been suppressed, and that a statement by Hernando that he and Leocadio had arrived at the apartment in the same vehicle was improperly admitted at the trial.

■ The detectives had ascertained prior to the arrival of Leocadio and Hernando that the apartment was an operating cocaine mill. When Leocadio and Hernando arrived at the apartment, each carrying a bag, it was natural for the detectives to become suspicious. When in response to Detective Prakin's invitation to come into the apartment Leocadio stepped to his left and dropped the bag he was carrying, the detectives' suspicions were understandably amplified. Leocadio has no standing to challenge the search of the bag he abandoned in the hallway. *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *United States v. Salvucci*, 448 U.S. 83, 91–93, 100 S.Ct. 2547, 2552–2554, 65 L.Ed.2d 619 (1980). Finding cocaine inside the bag, the detectives had probable cause to arrest Leocadio.

■ Leocadio contends that a *Bruton* problem is raised because Hernando informed the detectives that both he and Leocadio had arrived in the same vehicle. (*Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)). Leocadio applied for a severance on the ground that if Hernando's statement to the detectives was received into evidence and Hernando chose not to take the stand, Leocadio would be denied his right to cross-examine Hernando. The district judge found that Hernando's "allegedly inculpatory" statement was not "vitally important" to the government's case, and so denied the severance. Finding that the district court's denial of the severance motion did not "substantially prejudice" Leocadio, we discern no violation of *Bruton. United States v. Weisman*, 624 F.2d 1118, 1129–30 (2d Cir.), *cert. denied*, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980); *accord, United States v. Losada*, 674 F.2d 167, 171 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982).

*Hernando Caro*

■ Hernando contends that he was arrested without probable cause, and so the trial court should have suppressed the contents of the bag taken from him and searched incident to his arrest. Prior to Hernando's arrival, the detectives had ascertained that the apartment was operating as a cocaine mill. When Hernando arrived at the apartment with Leocadio, each carrying a bag in his hand, it was natural for the detectives to become suspicious. When the detectives found cocaine in the bag dropped by Leocadio, they reasonably believed that the Caros were both engaged in a narcotics transaction. Upon these facts the detectives had probable cause to arrest Hernando, and the search of his person and of the bag he carried incident to his arrest was proper. *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *New York v. Belton*, 453 U.S. 454, 460–61, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981).

■ Hernando also contends that the testimony of Detective Prakin concerning the documents found in Hernando's bag deprived him of a fair trial. The record satisfies us that the trial judge acted within his discretion in receiving this testimony.

*Defendant Torres*

Defendant Torres pled guilty to Count 2 of the indictment (possession of cocaine with intent to distribute), his plea being conditioned on his right to appeal from the district court's denial of his motion to suppress. Like the other defendants, he contends that he was arrested without probable cause and that the items taken from him as a result of his arrest should have been suppressed.

When Torres arrived at the door of the apartment at 9:35 p.m. the detectives had been in the apartment for about an hour and a half. During that period they had reasonably concluded that the apartment was being used as a cocaine mill, and the Caros had arrived bringing cocaine. In view of this, it was reasonable for the detectives to suspect that Torres might be involved in the cocaine operation, and this was reinforced by the fact that Detective Prakin recognized Torres as a previous narcotics offender. Observing a bulge in Torres' jacket, it was reasonable and minimally intrusive that the detectives sought to determine the cause of the bulge. *United States v. Barlin*, 686 F.2d 81, 86 (2d Cir.1982). When the detectives found that the bulge was caused by a bag which in turn contained a plastic sandwich bag containing cocaine, this was sufficient to raise their suspicion to probable cause that Torres was a member of the cocaine ring. Torres was then placed under arrest, and a search of his person revealed car keys and a "beeper" which had the apartment's telephone number as its signal. A search of Torres' car, which was double-parked outside the apartment, revealed $4,000 of cash wrapped in a paper towel.

Whether probable cause existed to arrest Torres depends "upon whether, at the moment the arrest was made, ... the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *see also Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879 (1949).

■ We believe that, applying this test, the detectives may have had probable cause to arrest Torres when he entered the apartment, but they surely had probable cause when, following the investigatory search of the bulge in his jacket, they discovered the cocaine. Therefore, the investigatory seizure of the brown paper bag inside Torres' jacket as well as the subsequent search of his person and of his car following his arrest, were lawful, and his motion to suppress was properly denied.[2]

2. *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

In view of the foregoing, we find that the defendants' convictions should be AFFIRMED.